PER CURIAM.
John Lee Hampton appeals his judgment of conviction for first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For reasons set forth below, we affirm Hampton’s conviction and death sentence.
FACTUAL AND PROCEDURAL HISTORY
Overview
On June 25, 2009, a jury convened in Pinellas County, Florida, convicted John Lee Hampton on a single count of first-degree murder for causing the June 10, 2007, death of Renee McKinness. At the penalty phase, the jury recommended a sentence of death by a vote of nine to three. After conducting a Spencer hearing, the trial court entered an order imposing the death penalty. After the jury entered its recommendation of death, Hampton filed several motions seeking relief based on the allegation that one of the jurors on his case, Juror D, was “under prosecution” at the time of his jury service. The trial court denied Hampton’s motions relating to Juror D’s alleged disqualification. In this direct appeal of his judgment of conviction and death sentence, Hampton raises five issues challenging various rulings and conclusions reached by the trial court, and the consti *103 tutionality of Florida’s capital sentencing scheme.
We first discuss the factual and procedural history of the case. We then address the legal issues raised by Hampton in his direct appeal. Further, in accordance with our independent duty to do so, we also examine the sufficiency of the evidence and the proportionality of the death sentence. We conclude that the trial court did not err as alleged by Hampton, and we also conclude that competent, substantial evidence supports the jury’s verdict of guilt. Finally, we hold that under the facts and circumstances presented here, the sentence of death is proportionate. Accordingly, we affirm Hampton’s conviction for first-degree murder and the sentence of death.
The Crime Scene and Investigation
On June 10, 2007, at approximately 10 a.m., the nude body of Renee McKinness (the victim), a twenty-five-year-old single mother of three, was found dead, lying face up in her own blood on the floor of her bedroom in her apartment in Clear-water, Florida. The victim’s bedroom was in a state of disarray, with drawers, clothes, and a mattress strewn about the room. The victim had suffered numerous injuries, including hemorrhaging of the brain, multiple sharp trauma injuries, defensive wounds, and the complete severing of her jugular vein. The victim’s face and eyes were bruised and swollen. The victim’s legs were spread open and her body had a petroleum-like odor. A blue soapy liquid was found in her vagina, along with semen. Two bloody handprints were found on the floor, one on each side of the body; and the walls and floor of the victim’s bedroom had blood spatters and stains suggestive of a struggle occurring on the floor.
A police officer who was called to the scene inspected the contents of a garbage dumpster outside the victim’s apartment and found bloody socks, a canister of lighter fluid, a bottle of cleaning solution, and bloody bed linens — all of which were collected for testing. While the police were processing the crime scene and gathering information by talking to the victim’s friends and neighbors, Reginald Span and his wife Dorothy, family friends of the victim who had received a telephone call regarding the victim’s demise, drove to the crime scene and approached the police. Dorothy’s brother-in-law, John Lee Hampton (the defendant), a thirty-three-year-old man who had recently moved from Georgia into the Span household, had come with the Spans to the crime scene at Dorothy’s insistence. Although the Spans immediately approached the police, Hampton indicated he was “not going up there,” and walked to another part of the apartment complex to avoid the police.
Unbeknownst to Dorothy Span, her husband Reginald was having a romantic affair with the victim. And, on the previous evening into the early morning hours, Reginald, the victim, Hampton, and a female friend of the victim were at the victim’s apartment drinking gin and playing cards. Although Reginald Span knew that his story would not help his marriage, he told the police and his wife about the “card party” at the victim’s apartment. Upon hearing her husband’s version of events, Dorothy Span set out to find Hampton to encourage him to talk to the police. The lead detective from the Clearwater Police Department spoke to Hampton at the crime scene, and he noticed that Hampton was not wearing socks. The detective also noticed that Hampton had what appeared to be dried blood on his feet, pants, and his necklace. According to the detective, Hampton initially admitted that he was at the victim’s apartment playing cards into the early morning hours. Hampton, how *104 ever, reported that both he and Reginald Span left the victim’s apartment at approximately 3 a.m., and Hampton provided no indication that anything else had occurred. Hampton told the detective that he “spent the night” at the Span residence. Hampton and Reginald Span were detained for further questioning and transported to the Clearwater Police Department.
Reginald Span’s Version of the Events
Reginald Span told the police, and consistently testified at trial, that in the evening hours of June 9, 2007, he and Hampton, whom he refers to as his brother-in-law, went to the victim’s apartment where they drank gin and played cards with the victim and a female friend of the victim. According to Span, after several hours of playing cards, the victim’s female friend— an individual who testified at trial that she had rebuffed advances made by Hampton throughout the evening — left the victim’s apartment. Thereafter, Reginald Span and the victim went back to the victim’s bedroom and had consensual sexual intercourse. Span told the police that he did not ejaculate inside the victim because during intercourse he saw Hampton watching him and the victim through a crack in the bedroom door. Span stated that he then stopped his sexual encounter with the victim, spoke with the victim for a few minutes, hugged her, and left her lying in bed, healthy and unharmed.
According to Span, he and Hampton left the victim’s apartment at approximately 3:30 a.m. on June 10, 2007, with the front door left unlocked. Reginald Span told the police that he then drove Hampton back to the Span residence. When they arrived home, Reginald Span went inside his apartment, but Hampton did not. Hampton stated that he was going to see “some girl” that lived nearby, and he left. Reginald Span then went upstairs to bed, where his wife Dorothy was waiting, doffed and folded his clothes, and went to sleep. According to both Reginald and Dorothy Span — both of whom testified at trial — Hampton first returned to the Span residence later that morning between 8 and 8:30 a.m., with a newspaper and food items. When Hampton returned, the Span family and Hampton cleaned the Span’s home until a telephone call was received informing them that the victim had been found dead. Reginald Span then drove his wife and Hampton to the victim’s apartment complex. In response to a request made by the investigating detectives, Reginald Span gave the Clearwater Police Department the clothes he had been wearing the night before, and he consented to the search of his automobile and home. Testimony introduced at trial established that none of the physical evidence that was collected linked Reginald Span to the murder of the victim.
Hampton’s Post -Miranda Statement
At the Clearwater Police Department, Hampton was photographed and swabs were taken from his feet, pants, and'his necklace for DNA testing. Other than a small scrape on Hampton’s right foot, he had no injuries. After waiving his Miranda rights, Hampton gave a two-hour videotaped statement to the police. During his post-Miranda statement, Hampton relayed at least eight different descriptions of what occurred in the early morning hours preceding the victim’s death. Hampton admitted to playing cards at the victim’s apartment in the early morning hours, but initially he denied harming her or having sex with her. Hampton also initially told the interrogating officers that the blood on his feet was his own, and that his socks were not in a dumpster but were, instead, at the Span residence in his “bedroom shoes.” Consistent with the account of events relayed by Reginald Span, Hampton told the police that Reginald was *105 having an affair with the victim and that Reginald had sexual intercourse with her sometime during the card party. Hampton told the police that he and Reginald Span left the -victim’s apartment at approximately 3 a.m.
In his first account of the events, Hampton told police that once he arrived at the Span residence in the early morning hours, he went inside, drank a beer, and went to sleep in a chair downstairs. After further questioning, Hampton then relayed another version of the events, one that indirectly implicated Reginald Span as the individual who might have harmed the victim. In this narrative, Hampton stated that he “dozed off’ at the victim’s apartment after playing cards, and was awakened by Reginald Span who declared it was time to go home. Hampton recounted that he saw the victim lying on the floor, and that he tried to help her by performing CPR on her. Hampton reported that this was how his socks became saturated with the victim’s blood. In this version of the events, Reginald Span and Hampton then went back to the Span residence at 3 a.m. and went to sleep. While relaying this story, Hampton twice told the detectives that he did not have sex with the victim.
After further questioning by police, Hampton provided numerous additional narratives wherein he and the victim had sexual intercourse and he thereafter killed the victim. In each of the varying descriptions of his sexual encounter with the victim, Hampton reported that at some time during or after the sexual event, the victim attacked him with a knife, and that his act of killing the victim was in self-defense or accidental. In his final version of the events leading up to the victim’s death, Hampton stated that he and Reginald Span left the victim’s apartment at approximately 3 a.m., and after they arrived at the Span residence, Hampton did not go inside, but rather returned alone to the victim’s apartment. Hampton recounted that upon his return to the victim’s apartment, he had sex with her, she fell asleep, and he then attempted to steal money or drugs from her. According to Hampton, the victim caught Hampton riffling through her drawers, and in response to her attempt to stop him, he killed her with a knife. In this version of the story— consistent with the testimony of Reginald and Dorothy Span — Hampton returned to the Span residence when it was light outside. Hampton also admitted to using a rag, cleaning solution, and lighter fluid to try to clean his semen from the victim’s vagina. Nevertheless, he insisted that his sexual encounter with the victim was consensual. Hampton also admitted to throwing his bloody socks, the bloody bed linens, and the cleaning solution in the dumpster near the victim’s apartment. Upon further questioning, Hampton told police that Reginald Span was not involved in the victim’s death, and that Span was not at the victim’s apartment when Hampton killed her. Based on the evidence collected by the Clearwater Police Department, Hampton was charged on a single count of first-degree murder. Hampton pled not guilty.
The Trial
Jury selection commenced on June 22, 2009, with the trial court conducting the majority of the questioning of the venire. After the jury was empanelled and sworn, the State introduced the testimony of Reginald and Dorothy Span, the detectives who processed the crime scene, forensic experts, and other witnesses who observed the crime scene and confirmed the occurrence of the card party. Without objection, numerous photographs of the crime scene were used by the State to assist the witnesses in testifying to what they observed. A DNA analyst testified that the *106 substance found on Hampton’s pants, feet, and necklace was the victim’s blood, and that Hampton’s semen was found inside the victim’s vagina. Before the medical examiner testified regarding the autopsy of the victim, Hampton’s counsel objected to the State’s exhibits comprised of photographs taken during the autopsy on the grounds that these photographs were cumulative of those of the crime scene and unfairly prejudicial. Outside the presence of the jury, the trial court conducted a hearing regarding the photographs in question. The trial court excluded two of the autopsy photographs — one of the victim’s brain exposed on autopsy and a close-up photograph of the severed jugular vein. Thereafter, the medical examiner, using the remaining autopsy photographs, testified to the multitude of internal and external injuries suffered by the victim, and he opined that the cause of death was blunt and sharp force injuries, including suberaneal hemorrhaging and a complete severing of the jugular vein. During its case-in-chief, the State played the video of Hampton’s post-Miranda statement, wherein he admitted numerous times to killing the victim in the early morning hours of June 10, 2007.
After the State rested its case-in-chief, Hampton testified on his own behalf. He testified that he did not kill, harm, or steal from the victim, and his post-Miranda confessions admitting as much were lies. At trial, Hampton furnished a new narrative regarding his sexual encounter with the victim, one that differed from the various accounts furnished to the police in his post-Miranda statement. According to Hampton’s trial testimony, at some point during the card party Reginald Span stepped outside of the victim’s apartment to make a series of telephone calls, and during this time, Hampton and the victim had consensual sex in the victim’s bedroom. Hampton testified that Reginald Span then came back into the victim’s apartment, and Hampton fell asleep on a sofa. According to Hampton, he was later awakened by Reginald Span who said it was time to go home. Hampton saw the victim lying on the floor wounded and he tried to help her, but his efforts were thwarted by Span. According to Hampton, he noticed the blood on his socks, removed them, and threw them into a plastic trash can, which he then threw into the dumpster. Thereafter, according to Hampton’s trial testimony, he and Reginald drove back to the Spans’ apartment, where they each drank a beer and went to sleep. At trial, Hampton stated that the reason he told the police in his post -Miranda statement that he killed the victim was because he had told the police the truth at first, but grew tired of answering questions.
On cross-examination at trial, Hampton testified that he had previously been convicted of four felonies, including a conviction for a crime involving dishonesty, and that he was on felony probation at the time of the victim’s death. Upon further cross-examination, Hampton admitted that consistent with his post-Miranda statement, he indeed attempted to remove his semen from inside the victim’s vagina with a rag and cleaning solutions. He testified that he did this while the victim was gasping for air and pleading for help. After Hampton was cross-examined by the State, no further testimony or evidence was offered.
Before the issue of Hampton’s guilt was submitted to the jury, Hampton’s counsel requested a jury instruction on “independent act,” that is, that the victim’s death was the result of the act of someone else, because the final theory of defense was that Reginald Span killed the victim. The trial court granted Hampton’s request for this instruction, and also furnished an instruction requiring the juiy to determine *107 whether Hampton’s post-Miranda statement was provided freely and voluntarily. After deliberation, the jury unanimously reached a guilty verdict on the charge of first-degree murder, the only charge filed against Hampton.
The Penalty Phase
At the penalty phase before the jury, the State introduced the testimony of Hampton’s Georgia probation officer. Hampton’s probation officer testified that at the time of the victim’s murder, Hampton was on felony probation for violation of the Georgia sex offender registry laws. Toward mitigation, Hampton introduced the testimony of several family members and his fourth-grade teacher, all of whom testified that Hampton had an extremely difficult and impoverished upbringing. Hampton also established he had not received any disciplinary reports during the two years of his incarceration in Florida. Outside the presence of the jury, the trial court inquired as to whether Hampton would be submitting psychological or psychiatric testimony. Hampton’s counsel stated that upon consultation with psychological experts and Hampton, a decision was made to not submit such testimony to the jury. On June 25, 2009, the jury made a recommendation of death by a vote of nine to three, and immediately thereafter, the jury was discharged by the trial court.
Beginning on November 19, 2009, 147 days after the jury entered its recommendation of death and was discharged from service, Hampton filed the first of three motions — the last two being amendments to the first — seeking to interview one of the jurors on his case. Hampton sought to interview Juror D based on the allegation that this juror was disqualified because, according to Hampton, the juror was “under prosecution” during his jury service.[1] The trial court denied these motions on the bases that Hampton failed to allege good cause why the motions were not filed within ten days of the verdict as required by Florida Rule of Criminal Procedure 3.575,[2] and because Hampton failed to aver or establish that the facts regarding the juror could not have been discovered with due diligence during jury selection, prior to the jury being sworn, during the trial, or immediately after the trial.
Spencer Hearing
At the Spencer hearing, an attorney who had previously represented Hampton in Georgia testified that the crime that rendered Hampton a sex offender in Georgia was that of child molestation. The attorney also testified that Hampton was on probation at the time of the murder for violation of the Georgia sex registry law because he was not living at the address that he had registered with the State of Georgia. Toward mitigation, Hampton’s Georgia attorney testified that Hampton was from an economically disadvantaged *108 area of Georgia and had little familial support, and thus, Hampton had few options regarding where he could live. At the Spencer hearing, Hampton also introduced the testimony of a forensic psychologist. The psychologist testified that Hampton has a psychotic disturbance and a brain dysfunction that would appear on a positron emission tomography (PET) scan, but no such scan was performed. The psychologist testified that his opinions were based , on discussions. he had with Hampton’s sister, personality testing that he performed on Hampton, and prison records relating to Hampton’s incarceration in Georgia that contain references to Hampton receiving psychiatric medication. The psychologist testified that in his opinion, Hampton’s mental conditions impair his ability to conform his conduct to the requirements of law, but do not affect his ability to appreciate the wrongfulness of his acts. The psychologist also testified that based on Hampton’s description of his alcohol and drug use on the day of the murder, Hampton was intoxicated at the time of the crime.
On cross-examination, the psychologist admitted that he administered the personality tests on Hampton in a manner that was questionable within the field of psychology, and that the validity of Hampton’s tests was also debatable. Further, the psychologist conceded that Hampton’s sister — upon whose verbal reports he relied in reaching his opinions — had not seen Hampton for the four years before the murder. The psychologist also testified that he had made no attempt to speak to any of the individuals with whom Hampton was living at the time of the murder to determine Hampton’s mental state at or near the time of the murder. Further, the psychologist testified that he had never heard of Reginald or Dorothy Span. Moreover, the psychologist also testified that he was “making the argument” that Hampton had a psychosis, and that the evidence for each of the mitigating factors to which he testified was “not real strong,” but “sometimes you just do the best you can in some cases where the evidence isn’t available that would substantiate things that you know to be out there.” And, in response to questioning from the trial court, the psychologist testified that he did not know why Hampton discontinued psychiatric medication while in prison in Georgia; but, it would not affect his opinion regarding Hampton’s mental condition if these medications had been discontinued, because Hampton was feigning mental illness.
After the Spencer hearing, the trial court conducted a sentencing hearing at which time the order imposing a sentence of death was read and filed. In the sentencing order, the trial court found that the State proved the following aggravators beyond a reasonable doubt, each of which was afforded great weight: the capital felony was committed by a person previously convicted of a felony and under probation, meeting the requirements of section 921.141(5)(a), Florida Statutes (2009); the capital felony was committed while the defendant was engaged in robbery, sexual battery, and burglary, meeting the requirements of section 921.141(5)(d), Florida Statutes (2009); and the capital felony was especially heinous, atrocious, and cruel, meeting the requirements of section 921.141(5)(h), Florida Statutes (2009).
Relative to mitigation, the trial court found that Hampton established that he has “mental health issues,” but that Hampton failed to establish the presence of statutory mental mitigation. The trial court rejected much of the psychological opinion testimony offered by Hampton at the Spencer hearing, because the trial court found the foundation of the opinion was faulty and insufficient, and the opinions *109 were inconsistent with other evidence. The trial court concluded that Hampton’s “mental health issues” qualify as “non-statutory” mitigation and were entitled to little weight. The trial court found that Hampton established the presence of the following six additional “non-statutory” miti-gators, each of which was entitled to little weight: (1) Hampton was neglected during his childhood; (2) Hampton was physically abused by his stepfather during his childhood; (3) Hampton was abandoned by his parents and was raised poorly; (4) Hampton has a family that cares about him; (5) Hampton has an exemplary discipline record in jail and displayed model behavior during his week-long trial; and (6) the non-unanimous (nine to three) jury verdict. After assigning weight to the aggravators and mitigators, the trial court concluded that “the aggravating factors in this case are horrendous” and “greatly outweigh the comparatively insignificant mitigating factors.” Based on this analysis, the trial court concluded that the death penalty was both appropriate and proportional.
After the sentence of death was imposed by the trial court, Hampton filed a timely motion for new trial because, according to Hampton, Juror D was statutorily disqualified from serving as a juror under section 40.013. In his motion for a new trial, Hampton alleged the following specific factual and legal bases for relief:
a. On June 6, 2009 [Juror D] was arrested for loitering and prowling and possession of drug paraphernalia.
b. On July 23, 2009, an Information charging possession of drug paraphernalia was filed.
c. [Juror D] entered a plea of no contest on October 9, 2009.
d. Pursuant to 40.013(1), no person who is under prosecution for any crime ... shall be qualified to serve as a juror.
The trial court denied Hampton’s motion for a new trial based on its conclusion that Juror D was not statutorily disqualified from serving as a juror, because Juror D did not come under prosecution until the misdemeanor information was filed, which occurred after, the conclusion of Juror D’s jury service. This appeal followed.
Juror Disqualification
In the first issue raised in this appeal, Hampton argues that because Juror D was “under prosecution” at the time of his jury service, the trial court erred in denying Hampton’s requests for a juror interview or a new trial based on Juror D’s lack of statutory qualifications to serve as a juror. As we explain below, Hampton’s arguments on this point are unavailing primarily because the juror in question was not “under prosecution” at the time of his jury service. Hampton also argues on appeal that Juror D engaged in misconduct during voir dire by providing an incomplete answer to a question posed by the trial court as to whether he or a family member had ever been “accused of a crime.” We conclude that Hampton both abandoned and failed to preserve by presenting in a meaningful way any legal or factual argument for relief based on juror concealment, misrepresentation, or misconduct. Accordingly, we affirm the trial court’s denial of Hampton’s motions for relief based on the alleged disqualification of Juror D.
Facts Relating to Juror D’s Arrest and Prosecution
The arrest affidavit pertaining to Juror D establishes that on June 6, 2009, approximately two weeks before jury selection began in Hampton’s case, Juror D was detained by an officer of the Clearwater Police Department for loitering. A search of Juror D’s person relative to this arrest yielded a ceramic pipe that Juror D admitted had been used to smoke marijuana. *110 The arrest affidavit relating to this incident indicates that Juror D was released on his own recognizance on the day of the arrest and no bond was imposed. Further, the spaces within the arrest affidavit pertaining to the requirement that Juror D appear in court at a future date, or pay a fine for the charge of possession of drug paraphernalia, were left blank. Moreover, the arrest affidavit indicates that a “total” of “$0.00” was being requested “for Investigative Costs.”
Voir dire commenced on June 22, 2009, with Juror D being selected as a member. The jury was discharged on June 25, 2009, after finding Hampton guilty of first-degree murder and recommending a sentence of death by a vote of nine to three. The misdemeanor information filed against Juror D was filed in the County Court in Pinellas County by the State Attorney’s office, on July 23, 2009, after Juror D had concluded his service as a juror on Hampton’s case.
Disqualification under Section 40.013
The issue presented in this point on appeal is whether a potential juror who has been arrested, but not yet formally charged by a prosecutor for a crime, is “under prosecution,” so as to render the individual statutorily unqualified to serve as a juror under section 40.013, Florida Statutes (2008). Because this issue presents a question of statutory interpretation, the standard of review is de novo. See Allstate Ins. Co. v. Holy Cross Hosp., Inc., 961 So.2d 328, 331 (Fla.2007) (explaining de novo standard of review applies to questions of statutory interpretation). Section 40.013(1), Florida Statutes (2009), states:
No person who is under prosecution for any crime, or who has been convicted in this state, any federal court, or any other state, territory, or country of bribery, forgery, perjury, larceny, or any other offense that is a felony in this state or which if it had been committed in this state would be a felony, unless restored to civil rights, shall be qualified to serve as a juror.
Section 40.013 provides no specialized definition of the phrase “under prosecution.” Accordingly, the phrase should be afforded its plain and ordinary meaning, giving due regard to the context within which it is used. See School Bd. of Palm Beach Cnty. v. Survivors Charter Schools, Inc., 3 So.3d 1220, 1233 (Fla.2009); see also Miele v. Prudential-Bache Securities, Inc., 656 So.2d 470, 472 (Fla.1995) (explaining that plain meaning of a word is “derived from the context in which the language lies”). In examining the context within which the phrase “under prosecution” lies relative to issues of juror qualifications, it is noted that sections 40.022(1) and (4) (Clerk to purge jury selection lists; restoration) impose a duty upon the clerk of each circuit court to purge monthly from the list of potential jurors the names of those individuals disqualified from jury service by operation of section 40.013. See § 40.022(1) & (4), Fla. Stat. (2009).
Hence, it follows that the Legislature intended disqualification under section 40.013 to operate against only those individuals who are legally “under prosecution” under Florida law, and not against an amorphous and otherwise unknowable class of individuals that might come under prosecution in the future — the definition urged by Hampton on appeal. The process of “prosecution” under Florida law is distinct from the process of being arrested or charged by an arresting officer. See, e.g., § 775.15(4)(a), Fla. Stat. (2009) (demonstrating distinction between arrest and prosecution by stating, “Prosecution on a charge on which the defendant has previously been arrested or served with a summons is commenced by the filing of an *111 indictment, information, or other charging document.”) (emphasis added).
The Florida Rules of Criminal Procedure, under a section entitled “Methods of Prosecution,” provide that the “prosecution” of non-capital crimes shall “be solely by indictment or information,” except that prosecution of misdemeanors “may be by notice to appear issued and served pursuant to rule 3.125.” See Fla. R.Crim. P. 3.140(a)(2) (emphasis added). And, Florida Rule of Criminal Procedure 3.125 defines a “notice to appear” as a written order requiring the accused to appear in a designated court “at • a specified time.” See Fla. R.Crim. P. 3.125(a).
Section 775.15(1)-(16), Florida Statutes (2009) (Time limitations; general time limitations; exceptions), sets forth the relevant statutes of limitations for the “prosecution” of various crimes in the State of Florida. And specifically, as noted earlier, section 775.15(4)(a) — the statute of limitations applicable to Juror D’s misdemeanor charge — provides that “[pjrosecution on a charge on which the defendant has previously been arrested or served with a summons is commenced by the filing of an indictment, information, or other charging document.”
A review of this Court’s opinions confirms that the “under prosecution” language contained in section 40.013(1) has been interpreted to apply only where the potential juror is in fact under prosecution in accordance with Florida law. Importantly, under this Court’s case law, the phrase “under prosecution” has not been expanded to apply to those circumstances where an individual, although not technically under prosecution, might have similar motives to those under prosecution. See Johnston v. State, 841 So.2d 349, 357 (Fla. 2002) (explaining juror was not “under prosecution” as term is used in section 40.013(1) where juror pled to criminal charge, but was still subject to an outstanding capias and arrest for non-payment of fines relating to plea, because pending arrest for non-payment involved civil, not criminal, contempt under Florida law); see also Willacy v. State, 640 So.2d 1079, 1082 (Fla.1994) (concluding juror who was in Pretrial Intervention Program was not “under prosecution” as term is used under section 40.013(1), because pretrial intervention is “an alternative to prosecution”); Everett v. State, 97 So.2d 241, 246 (Fla.1957) (concluding juror was not “under prosecution” where his conviction for grand larceny was reversed on appeal, and where his case, although still subject to prosecution, was not on any active court docket for a number of years, and no further steps had been taken in cause); Likens v. State, 153 Fla. 887, 16 So.2d 158 (1944) (concluding criminal prosecution was not “pending” against juror where once-active prosecution was transferred to absentee docket, and where only affirmative act by the state would revive prosecution).
Based on the foregoing, the prosecution against Juror D on the charge of possession of drug paraphernalia could only be commenced by the filing of an indictment, an information, or a notice of appearance. Fla. R.Crim. P. 3.125(a). The arrest affidavit pertaining to Juror D did not contain a notice of appearance. See Fla. R.Crim. P. 3.125(a). And, the prosecution against Juror D was, in fact, commenced by the filing of an information after Juror D had fully served on the jury for which he was selected. Based on the foregoing, Juror D was not under prosecution at the time of his jury service. Hence, Juror D-was not statutorily disqualified under section 40.013 from serving as a juror. Therefore, the trial court did not err in denying Hampton’s requests for relief based on Hampton’s allegations that *112 Juror D was under prosecution during his service as a juror.
Hampton also argues, however, that Juror D engaged in misconduct by concealing his arrest and potential prosecution during voir dire. Hampton failed to preserve this argument by presenting it in a meaningful way to the trial court. See § 924.051(l)(b) & (3), Fla. Stat. (2009) (stating non-fundamental error must be preserved for appeal by presenting “sufficiently precise” issue to trial court for a ruling); see also Aills v. Boemi, 29 So.3d 1105, 1108 (Fla.2010) (“[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”) (citations omitted). Although Hampton initially requested relief based on juror concealment in his first motion to interview Juror D, this argument was abandoned by Hampton when his counsel told the trial court that he was withdrawing the allegation. Hampton’s trial counsel explained to the trial court that in contrast with his initial allegation that Juror D was asked direct questions regarding whether he was under prosecution, review of the transcript of voir dire revealed that Juror D was “asked something else.” Hampton’s amended motions to interview Juror D and his motion for a new trial eliminated any allegation that Juror D engaged in misconduct or concealed his arrest. Hampton- did not present to the trial court any argument based on those portions of the voir dire transcript that he now argues on appeal constitute juror concealment or misconduct. Accordingly, because Hampton’s arguments regarding juror misconduct or concealment were not sufficiently preserved below, we find no error in, and thus affirm, the trial court’s denial of the relief requested by Hampton based on Juror D’s arrest and eventual prosecution.
 Moreover, although Hampton did not argue in any meaningful way to the trial court that he was entitled to a new trial or a juror interview based on Juror D’s misconduct or concealment, even if this argument had been made below, it is unavailing for a number of reasons. This Court has held that
[i]n determining whether a juror’s nondisclosure of information during voir dire warrants a new trial, courts have generally [used] a three-part test. First, the complaining party must establish that the information is relevant and material to jury service in the case. Second, that the juror concealed the information during questioning. Lastly, that the failure to disclose the information was not attributable to the complaining party’s lack of diligence.
De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995). We have also held that an evidentiary hearing need not be held on every allegation of juror misconduct, and the defendant must “at least” allege facts establishing a prima facie argument for prejudice. See State v. Hamilton, 574 So.2d 124, 130 (Fla.1991). Under De La Rosa’s first prong, the complaining party must establish “not only that the non-disclosed matter was ‘relevant’ ... but also that it is ‘material to jury service in the case.’ ” Roberts v. Tejada, 814 So.2d 334, 339 (Fla.2002) (quoting De La Rosa, 659 So.2d at 241). A juror’s nondisclosure of information is considered material where “the omission [of the information] prevented counsel from making an informed judgment — which would in all likelihood have resulted in a peremptory challenge.” De La Rosa, 659 So.2d at 242 (internal citations omitted).
Here, Hampton’s numerous motions do not allege or aver a prima facie set of facts that, if taken as true, would establish actual prejudice or a basis for relief under the *113 De La Rosa standards. Other than the incorrect assertion that Juror D was “under prosecution,” Hampton’s motions contain no assertion of facts that would establish the materiality of Juror D’s arrest. Additionally, Hampton’s motions fail to establish a prima facie showing that Hampton’s failure to uncover Juror D’s arrest was not attributable to a lack of diligence on his part.
During the jury selection process, the members of the venire were not directly asked by anyone whether any of them had been arrested or were currently under prosecution, or even whether any of them had ever been convicted of a crime. Rather, the venire was asked the following compound questions by the trial court: “Have you or any member of your immediate family or any close friend been accused of a crime?” (in a pre-voir dire questionnaire), and “Have you or any member of your immediate family been accused of a crime?” (posed orally during voir dire). In those instances where a potential juror indicated that they or a family member had been “accused” of a crime — and there were many such instances, particularly relating to family members — the follow-up questions, posed by the trial court, related to whether the potential juror had any “dissatisfaction with the way the case was processed,” and whether they could “set aside” the experience. And, none of the participants entitled to question the venire expressed an apparent interest in whether the crime was a felony or misdemeanor, whether there was a conviction or not, or whether the prosecution was ongoing.
In response to the trial court’s oral question to the venire regarding whether the members of the venire or a family member had been accused of a crime, Juror D indicated that his sister had been accused of a crime, he had “no problem with the way it was processed,” and he could “set it aside.” On appeal, Hampton presents no meaningful argument or basis to conclude that Juror D’s representation that his sister had been charged with a crime that was processed through the court system is false. Accordingly, at most, Hampton argues that Juror D’s answer to the trial court’s compound question was incomplete because Juror D did not also reference his own arrest. Because Hampton did not engage in any meaningful inquiry to determine the details regarding the many crimes reported by the venire members, there is no reasonable basis to conclude that Hampton viewed this line of questioning as an exploration of whether any of the venire members or their family members were currently amenable to prosecution. Because Hampton fails to establish that Juror D’s incomplete answer to the questions posed by the trial court was relevant and material to jury service, or was not due to his own lack of diligence, he fails to establish even a prima facie showing of a basis for relief under the De La Rosa test.
Based on the foregoing, and irrespective of Hampton’s failure to preserve the issue relative to juror concealment, we find no error with the trial court’s denial of Hampton’s multiple motions seeking relief based on the assertion that Juror D had been arrested two weeks before being selected as a juror on Hampton’s case. Thus, we affirm the trial court’s denials of Hampton’s request for relief on such grounds.
Felony Murder Instruction
In the second point on appeal, Hampton argues that competent substantial evidence does not support a finding that he sexually battered the victim. Thus, Hampton argues that the trial court erred in providing an instruction that permitted the jury to find that he committed first-degree murder based on the commission of the underlying felony of sexual *114 battery. Hampton concedes that he did not present this argument to the trial court and that he raised no objection to the first-degree felony murder instruction at trial. Nevertheless, Hampton argues that this issue did not need to be preserved because the error is fundamental, or because this Court has an independent obligation to review the sufficiency of the evidence. Hampton’s argument regarding preservation is incorrect. For an argument to be cognizable on appeal, it must be raised with specificity at trial. See § 924.051(l)(b) & (8) (explaining that, in the absence of fundamental error, appeal may not be taken unless error is preserved, and stating, “‘Preserved’ means that an issue, legal argument, or objection to evidence was timely raised before, and ruled on by, the trial court, and that the issue, legal argument, or objection to evidence was sufficiently precise.... ”); see also F.B. v. State, 852 So.2d 226, 230 (Fla. 2003).
A defendant must preserve claims of insufficiency of the evidence through a timely challenge in the trial court, with only two exceptions. See 852 So.2d at 230. First, because this Court has an independent obligation to determine whether competent substantial evidence supports a verdict of guilt in a death penalty case, a defendant sentenced to death need not preserve the issue of whether the guilty verdict can be sustained under any reasonable interpretation of the evidence after all factual disputes have been resolved in favor of the verdict on appeal. Id. Nevertheless, this limited exception does not excuse a party from raising any other particular objection relating to the sufficiency of the evidence. See id. “The second exception to the requirement that claims of insufficiency of the evidence must be preserved occurs when the evidence is insufficient to show that a crime was committed at all.” Id. Here, Hampton does not argue that the evidence is such that the jury could not have found that a crime was committed, nor does he argue that competent substantial evidence does not support the verdict of guilt on the charge of first-degree murder based on theories other than felony murder during a sexual battery, i.e., premeditated murder or felony murder as a consequence of a robbery or burglary. Accordingly, we deny Hampton’s request for relief on this point on appeal based on his failure to present this argument to the trial court.
Notwithstanding Hampton’s failure to preserve this issue below, as discussed under our analysis of the sufficiency of the evidence, we conclude that the evidence here was sufficient to warrant an instruction on felony murder predicated on the commission of a sexual battery. Further, this Court has held that “[a] general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004). Thus, although it is only necessary for this Court to conclude that competent, substantial evidence supports one of the various theories of guilt argued by the State, here competent, substantial evidence supports the guilty verdict based on every theory of guilt argued by the State, making Hampton’s arguments on this point without merit.
Prejudicial Photographs
In the third point on appeal, Hampton argues that the trial court erred in allowing the introduction of particular photographs of the victim’s body on autopsy. Hampton argues that the photographs of the victim on autopsy were both prejudicial and cumulative of other photographs introduced into evidence. Thus argues *115 Hampton, the admission of these photographs was reversible error. We conclude that Hampton’s arguments in this point are unavailing and do not establish any level of error committed by the trial court.
That a photograph is prejudicial does not justify its exclusion as evidence; rather, a relevant photograph must be unfairly prejudicial to be excluded. See Sexton v. State, 697 So.2d 833, 837 (Fla.1997) (“Section 90.403 does not bar the introduction of all evidence that is prejudicial ...; indeed, as a practical matter, almost all evidence introduced during a criminal prosecution is prejudicial to a defendant.”). Similarly, just because a photograph is gruesome does not make the photograph inadmissible. See Harris v. State, 843 So.2d 856, 864 (Fla.2003). The admission of photographic evidence of a murder victim is within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent abuse. See Ault v. State, 53 So.3d 175, 199 (Fla.2010) (“[A] trial court’s decision to admit photographic evidence will not be disturbed absent an abuse of discretion.”), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011); Harris, 843 So.2d at 864 (“The admission of such photographs is within the trial court’s discretion and will only be reversed when an abuse of discretion has been demonstrated.”); Rose v. State, 787 So.2d 786, 794 (Fla.2001) (“Absent a clear showing of abuse of discretion by the trial court, a ruling on admissibility of such evidence [gruesome photographs] will not be disturbed.”); Mansfield v. State, 758 So.2d 636, 648 (Fla.2000) (“We review a trial court’s ruling on a section 90.403 objection on an abuse of discretion standard.”) (citing State v. McClain, 525 So.2d 420, 422 (Fla.1988)).
As a preliminary matter it is noted that, based on Hampton’s objections, the trial court excluded from evidence two autopsy photographs — one of the victim’s brain exposed on autopsy, and a close-up photograph of the severed jugular vein. The remaining autopsy photographs, those at issue here, are photographic depictions of multiple abrasions, injuries, and bruising suffered by the victim. The “unfairly” prejudicial nature of the photographs at issue is neither self-evident nor well-defined by Hampton. Although Hampton argues that the autopsy photographs are duplicative or cumulative of other photographs introduced into evidence without objection, this Court has consistently stated that the test for admissibility of photographic evidence is relevance, not necessity. See Armstrong v. State, 73 So.3d 155, 168 (Fla.2011) (stating “trial courts have broad discretion in admitting photographic evidence and the test for the admission of such evidence is not whether the evidence is necessary.”).
The photographs referred to by the Medical Examiner in explaining the injuries that he observed on autopsy were relevant to and probative of, inter alia, the foundation of the Medical Examiner’s opinion of the cause of the victim’s death; the number and types of wounds inflicted by the perpetrator; and whether the victim accidentally caused her own fatal injuries as claimed by Hampton in his post-Miranda statement. These issues of fact, each of which the State was required to prove beyond a reasonable doubt, were all relevant to the charges of first-degree murder, under both the felony murder and premeditated theories of guilt. Further, here, none of the photographs that Hampton objects to on appeal is identical to other photographs admitted into evidence, and each shows a different angle or view of the multiple injuries suffered by the victim. Moreover, any duplication in the im *116 ages is slight and is in no way independently prejudicial.
Because Hampton does not establish any meaningful level of unfair prejudice, much less unfair prejudice that “substantially” outweighs the significant probative value of the photographic evidence that he argues should have been excluded from evidence, he fails to establish an abuse of discretion committed by the trial court. Accordingly, the relief requested by Hampton in this point on appeal is denied.
Challenge to Florida’s Capital Sentencing Scheme
In the fourth point on appeal, Hampton argues that Florida’s capital sentencing scheme violates the ruling of the United States Supreme Court in Ring v. Arizona because under Florida’s scheme, the jury merely occupies an advisory role on the sentence of death, and the jury is not required to make a unanimous finding on the aggravators in question. 536 U.S. 584, 609, 122 S.Ct. 2428, 158 L.Ed.2d 556 (2002) (holding that Sixth Amendment right to trial by jury rendered Arizona death penalty unconstitutional “to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty”). Under this Court’s precedent, Hampton’s argument on this point is without merit.
The “under sentence of imprisonment or ... on felony probation” ag-gravator provided for in section 921.141(5)(a) was established without dispute. Hampton, his lawyer from Georgia, and Hampton’s probation officer from Georgia testified that Hampton was under felony probation and in violation of his probation at the time of the capital crime, removing any question as to the applicability of the aggravator provided for under section 921.141(5)(a). This Court has held that this aggravator need not be submitted to a jury, and where this aggravator is present, Ring is not applicable. See Allen v. State, 854 So.2d 1255, 1262 (Fla.2003) (rejecting Ring challenge and stating that “one of the aggravating factors in this case was that the murder was committed while Allen was under a sentence of imprisonment. Such an aggravator need not be found by the jury.”). Further, “[t]his Court has repeatedly held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment [aggravator] is applicable.” Hodges v. State, 55 So.3d 515, 540 (Fla.2010); see also Victorino v. State, 23 So.3d 87, 107-08 (Fla. 2009). Thus, Hampton’s arguments that Florida’s sentencing scheme is unconstitutional are rejected.
Statutory Mitigation
In the fifth point on appeal, Hampton argues that the trial court erred in rejecting the opinion testimony of the forensic psychologist that he introduced at the Spencer hearing. Accordingly, Hampton argues, the trial court erred by concluding that he failed to establish the presence of statutory mental mitigation provided for under sections 921.141(6)(b) & (f), Florida Statutes (2009). The premise of Hampton’s argument is that, because the psychological opinion testimony he introduced at the Spencer hearing went unrebutted by the State, the trial court was without legal authority to reject this testimony. We disagree with Hampton’s stated premise on this point.
The relevant question presented here is whether the record contains competent, substantial evidence to support the trial court’s rejection of the mitigation. Durousseau v. State, 55 So.3d 543, 560 (Fla.2010) (“This Court will not disturb a *117 trial court’s rejection of a mitigating circumstance if the record contains competent, substantial evidence to support the trial court’s rejection of the mitigation.”). A trial court may reject mitigation where there is a rational basis for doing so. Id. Where the asserted mitigating circumstance is based on expert testimony that is tenuous, poorly supported by the facts, or equivocal, the trial judge has the discretion to reject such testimony. See Walls v. State, 641 So.2d 381, 390 n. 7. (Fla.1994) (noting that expert psychological testimony regarding mental derangement was equivocal and stating, “The expert testimony ... is too tenuous and too poorly supported by the facts to detract from the judge and jury’s decision to impose death.”). A trial court may reject mitigation based on expert testimony, even if that testimony is uncontroverted, “where it is difficult to square with the other evidence in the ease.” Morton v. State, 789 So.2d 324, 330 (Fla.2001). In Walls, this Court stated, “Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve.” 641 So.2d at 390-91.
Here, although the State did not introduce competing psychological opinion testimony at the Spencer hearing, the record evidence demonstrates that the foundation of the psychologist’s opinion offered by Hampton at the Spencer hearing was debatable, tenuous, and not fully supported by the facts of the case. Thus, the record provides a rational basis for the trial court to have rejected some or all of the psychologist’s testimony regarding the presence of statutory mental mitigation. See Durousseau, 55 So.3d at 560 (explaining trial court may accept or reject testimony of expert just as it may accept or reject the testimony of any other witness). Further, to the extent that the psychologist testified that Hampton’s alleged psychotic condition prohibits Hampton from conforming his actions to the requirements of the law, Hampton inconsistently introduced evidence that he was an exemplary prisoner, and that he displayed model behavior during his week-long trial. See Coday v. State, 946 So.2d 988, 1003 (Fla.2006) (“Even expert opinion evidence may be rejected if that evidence cannot be reconciled with the other evidence in the case.”). Accordingly, we conclude that the record contains competent, substantial evidence and a rational basis for the trial court to have rejected all or part of the psychologist’s opinion testimony regarding Hampton’s mental health conditions.
Moreover, the trial court, after considering all of the evidence, found that Hampton’s mental health issues were mitigating factors, but only entitled to little weight. The weight ascribed to a miti-gator is a matter within the trial judge’s discretion that will not be disturbed on appeal absent a showing of abuse. See Spann v. State, 857 So.2d 845, 859 (Fla. 2003). Here we find no basis to conclude that the trial court erred in assigning little weight to Hampton’s mental health issues. Further, considering that the trial court found the three aggravating factors were “horrendous” and the seven non-statutory mitigators were independently and collectively entitled to little weight, there is no reasonable probability that the mental mitigation, even if granted a “statutory” designation, would be assigned weight sufficient to alter the outcome or counterbalance the significant aggravation found by the trial court. See, e.g., Orme v. State, 677 So.2d 258, 263 (Fla.1996) (holding death sentence proportional for sexual bat *118 tery, beating, and strangulation of victim, where there were three aggravators including HAC, notwithstanding two statutory mental mitigators). Accordingly, although we find no error in this point, any error alleged by Hampton is harmless. Based on the foregoing, we reject Hampton’s arguments raised in this point on appeal and deny his request for a new penalty phase proceeding.
Sufficiency of Evidence
This Court has an independent obligation to review the record for sufficiency of the evidence. See Fla. RApp. P. 9.142(a)(5); Rodgers v. State, 948 So.2d 655, 673-74 (Fla.2006). A judgment of conviction comes to this Court with a presumption of correctness and a claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment. Spinkellink v. State, 813 So.2d 666, 671 (Fla.1975). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
Here, the jury was given instructions on premeditated murder and felony murder premised on the commission of three separate felonies expressed in the alternative: “Sexual Battery or Robbery or Burglary.” Although it is only necessary for this Court to conclude that competent substantial evidence supports one of the theories of guilt presented to the jury, see Crain, 894 So.2d at 73, here competent substantial evidence supports the guilty verdict based on every theory of guilt argued by the State.
In his post-Miranda statement to law enforcement, Hampton admitted several times that he punched the victim, stabbed her with a knife, and killed her. Further, in this statement, Hampton told the police that his fatal confrontation with the victim began when he returned to the victim’s apartment alone, and the victim awoke in the early morning hours to find him riffling through her drawers in her bedroom as he was trying to steal the victim’s property. Additionally, Hampton admitted his fight with the victim ensued when the victim tried to stop him from stealing her property. In his post -Miranda statement, Hampton agreed that he was trying to silence the victim and she was fighting for her life. Hampton further admitted that he stole drugs and money from the victim. Hampton also admitted that he inflicted all of the victim’s numerous injuries, but Hampton himself had only a slight injury to his foot.
The Medical Examiner’s testimony corroborates that the victim died as the result of the injuries that Hampton admitted to administering. Specifically, the Medical Examiner testified that the victim was subjected to a significant beating while she was still alive, and she had a multitude of injuries, including swelling and bruising around both eyes, bruising of the forehead, abrasions on the left cheek and on the left side of the chin, a laceration of the upper right eyelid, a stab wound of the neck, and incised wounds of the hands caused by a sharp instrument. The Medical Examiner also testified that the defendant’s jugular vein was completely severed by a stab wound, and the cause of the victim’s death was blunt and sharp force injuries. The Medical Examiner further testified that the incisions on the victim’s hands were consistent with defensive wounds.
Moreover, at trial, an expert testified that the blood spatter patterns at the *119 scene of the crime were consistent with an attack that occurred on the floor, with the attacker on top of the victim and the victim resisting. This expert also testified that the bloody handprints on either side of the victim’s body were consistent with, although not conclusively indicative of, the attacker being on top of the victim. Further, a DNA analyst testified that swabs taken from the bottom of Hampton’s foot, his pants, his necklace, and the socks that Hampton admitted to throwing in a dumpster — all items identified by the collecting officer as having visible blood stains — were a definitive, positive match for the victim. And the semen found in the victim’s vagina, which Hampton tried to remove with chemicals while the victim lay dying and pleading for help, was Hampton’s. The foregoing evidence, which includes multiple admissions of guilt, is sufficient to permit a jury to conclude beyond a reasonable doubt that Hampton killed the victim while he was in the commission of, or attempting to commit or escape from, a burglary, robbery, or a sexual battery.
Further, the nature and number of the wounds inflicted in the confrontation — including multiple blunt traumas causing brain injuries, a complete severing of the victim’s jugular vein, and defensive wounds on the victim, accompanied by the absence of any significant wounds on Hampton[3] — provide a basis for a reasonable jury to conclude that the defendant killed the victim in a premeditated manner, with a conscious intent to kill. See Hodges, 55 So.3d at 541 (holding evidence sufficient to sustain finding of premeditated murder where victim had multiple injuries to head and neck, including severing of jugular vein); see also Green v. State, 715 So.2d 940, 943 (Fla.1998) (explaining premeditation may be shown by evidence such as “the nature of the weapon used, the presence or absence of adequate provocation ... and the nature and manner of the wounds inflicted.”). Although at trial Hampton testified that all of his statements made in his post-Miranda statement relating to stabbing, hitting, and killing the victim were lies, made because he was tired of the detectives asking questions, the jury was under no obligation to accept this testimony. See Fla. Std. Jury Instr. 7.11 (Penalty Proceedings — Capital Cases) (explaining it is up to the jury to determine what evidence is reliable, and the jury may believe or disbelieve all or any part of the testimony of any witness); see also Bradley, 787 So.2d at 738 (“In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)). Instead, the jury was free to accept those portions of the defendant’s testimony or statement that it found worthy of belief, and it was likewise permitted to reject those portions of the defendant’s testimony that were not. And here, the jury was so instructed, as was appropriate under the circumstances. Based on the foregoing, we conclude that the evidence is sufficient to support the jury’s verdict of guilt on the single count of first-degree murder based on all theories *120 of guilt argued by the State. We therefore affirm the conviction for first-degree murder.
Proportionality of Death Penalty
This Court reviews a death sentence for proportionality “regardless of whether the- issue is raised on appeal.” England v. State, 940 So.2d 389, 407 (Fla.2006); see also Fla. R.App. P. 9.142(a)(5).[4] In reviewing the proportionality of a sentence of death, the Court follows precedent that requires that the death penalty be “reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996). Therefore, in deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citations omitted). Accordingly, the Court considers the totality of the circumstances and compares the case with other similar capital cases. See Simpson v. State, 3 So.3d 1135, 1148 (Fla.2009).
Here, the jury recommended a sentence of death by a vote of nine to three. The trial court weighed the three aggravators proven by the State against the mitigation proven by Hampton and concluded that the three aggravating circumstances were “horrendous” and “greatly outweigh the comparatively insignificant mitigating factors” proven by Hampton. On this basis, the trial court imposed a sentence of death. This Court “will not disturb the sentencing judge’s determination as to ‘the relative weight to give to each established mitigator’ where that ruling is ‘supported by competent substantial evidence.’ ” Blackwood v. State, 777 So.2d 399, 412-13 (Fla.2000) (quoting Spencer v. State, 691 So.2d 1062, 1064 (Fla.1996)).
The trial court’s finding that Hampton was on felony probation at the time of the murder was supported by both Hampton’s trial testimony and the testimony of Hampton’s Georgia probation officer introduced by the State in the penalty phase. Both individuals testified that Hampton was on felony probation and in violation of that probation at the time of the murder. Further, the documents relating to Hampton’s probation in Georgia introduced at the penalty phase establish that, at the time of the murder, Hampton was on felony probation for violation of the Georgia sexual offender registry laws. Under the terms of the defendant’s probation, he should not have been residing in the State of Florida, or using drugs or alcohol. Accordingly, the record supports the trial court’s finding of the existence of the aggravator provided for under section 921.141(5)(a), Florida Statutes; and a review of the record as a whole provides no indication that the trial court abused its discretion in assigning this aggravator great weight.
Relative to the second aggravator found by the trial court, the record supports the finding that the murder of the victim was committed during the commission of a burglary, robbery, and sexual battery (as discussed above under the second and sixth issues on appeal). And a review of the record as a whole provides no basis to conclude that the trial court abused its *121 discretion in assigning great weight to the aggravator provided for under section 921.141(5)(d).
Relative to the HAC aggravator found by the trial court, the photographs of the crime scene and the victim’s body, combined with the testimony of the blood spatter expert and the Medical Examiner, provide an evidentiary basis from which a reasonable finder of fact could conclude that the victim’s death was the result of a prolonged, bloody, and torturous encounter with a knife-wielding attacker, and that the victim was conscious, nude, and defenseless while she sustained multiple blows and stab wounds at the hands of her assailant. To the extent that any argument might have existed that the victim was unconscious and unaware of her peril at the time of the attack, Hampton’s testimony at trial provided a basis for a reasonable fact finder to conclude otherwise. At trial, Hampton testified that when he last saw the victim, she was lying on her back and bleeding from her wounds, gasping for air, and begging for help, while Hampton used chemicals to remove his semen from her vagina. Based on the foregoing, the record provides an evidentiary basis for a reasonable finder of fact to find that the murder of the victim was especially heinous, atrocious, or cruel, satisfying the requirements of the aggravator provided for under section 921.141(5)(h), Florida Statutes. See Hernandez v. State, 4 So.3d 642, 669 (Fla.2009) (explaining HAC can be found where victim was acutely aware of her death for even mere seconds). Further, review of the record fails to reveal any indication that the trial court abused its discretion in assigning the HAC aggra-vator great weight. See e.g., Zommer v. State, 31 So.3d 733, 751 (Fla.) (noting that HAC is one of the weightiest aggravators in statutory sentencing scheme), cert. denied, — U.S. -, 131 S.Ct. 192, 178 L.Ed.2d 115 (2010). Based on the foregoing, the record supports the trial court’s conclusion that the aggravation proven by the State in this case was “horrendous” and worthy of great weight. Relative to mitigation, competent substantial evidence supports the trial court’s findings regarding the presence of mitigation, and review of the record fails to reveal any indication that the trial court abused its discretion in assigning little weight to the mitigation that was established.
The imposition of the death sentence in this case is proportional when compared to other death sentences that this Court has upheld. See, e.g., Everett v. State, 893 So.2d 1278, 1287-88 (Fla.2004) (affirming death sentence where victim was beaten, raped, and then suffocated after having her neck broken, where the trial court found three statutory aggrava-tors: (1) convicted felon under sentence of imprisonment, (2) commission during the course of a sexual battery or burglary, and (3) HAC; five statutory mitigators; and four nonstatutory mitigators); Douglas v. State, 878 So.2d 1246, 1262-63 (Fla.2004) (upholding death sentence where victim was sexually battered and beaten and trial court found two aggravators, HAC, and commission during course of sexual battery; one statutory mitigator; and sixteen nonstatutory mitigators); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (upholding death sentence where victim was sexually battered and strangled and trial court found two aggravating factors, previous violent felony conviction and HAC; one statutory mitigator; and twenty-six nonstatutory mitigators); Belcher v. State, 851 So.2d 678, 686 (Fla.2003) (upholding a death sentence where victim was sexually assaulted and then strangled and drowned where the trial court found three aggravating factors: (1) previous violent felony conviction, (2) commission during the *122 course of a sexual battery, and (3) HAC; and fifteen nonstatutory mitigators).
Based on the foregoing, this case falls into the class of cases with the most aggravating and least mitigating circumstances, the category of cases for which the death penalty is reserved.
Conclusion
After reviewing the issues brought on appeal and conducting our own independent review of the sufficiency of the evidence and the proportionality of the death penalty, we affirm Hampton’s conviction for first-degree murder and the sentence of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. In the first motion regarding juror disqualification, Hampton also alleged that Juror D concealed the fact that he was being prosecuted for a crime during voir dire "despite direct questioning on the issue.” Nevertheless, this allegation of juror concealment was unaccompanied by attachments or verification, and was withdrawn by Hampton's counsel. Hampton’s counsel explained to the trial court that the allegation was being withdrawn because he had read the transcript of voir dire and the juror was "asked something else.”

. Florida Rule of Criminal Procedure 3.575 provides that a party having reason to believe a verdict is subject to legal challenge may file a motion to interview a juror. This rule also provides that such motions "shall be filed within 10 days after the rendition of the verdict, unless good cause is shown for the failure to make the motion within that time.” Fla. R.Crim. P. 3.575.

. Upon being taken into custody for questioning, the defendant was processed and photographed, both with and without his shirt on. These photographs were authenticated by the lead detective and introduced into evidence by the State. The only wound depicted on the defendant’s body is a small ulcer-like injury above the right big toe, and this was the only injury to the defendant noted by the arresting officer at trial. Further, the forensic expert who took the photographs testified that other than the small scrape on the defendant's right foot, he had no injuries.

. Rule 9.142(a)(5), Florida Rules of Appellate Procedure, provides that "[i]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”