# Supreme Court of Florida

_____

No. SC15-1360
_____

**JOHN LEE HAMPTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-6
_____

**JOHN LEE HAMPTON,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 4, 2017]

PER CURIAM.

John Lee Hampton appeals an order of the circuit court denying his motion
to vacate his conviction of first-degree murder and sentence of death filed under
Florida Rule of Criminal Procedure 3.851, and petitions this Court for a writ of

habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  For the reasons explained below, we affirm the postconviction court's order to the extent it denies Hampton relief based upon his claim of ineffective assistance of guilt phase counsel.  However, we decline to address the remaining issues because we grant the habeas petition and order that Hampton receive a new penalty phase proceeding in light of Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017).

## FACTS AND PROCEDURAL HISTORY

This Court set forth the following facts on direct appeal:

On June 10, 2007, at approximately 10 a.m., the nude body of Renee McKinness (the victim), a twenty-five-year-old single mother of three, was found dead, lying face up in her own blood on the floor of her bedroom in her apartment in Clearwater, Florida.  The victim's bedroom was in a state of disarray, with drawers, clothes, and a mattress strewn about the room.  The victim had suffered numerous injuries, including hemorrhaging of the brain, multiple sharp trauma injuries, defensive wounds, and the complete severing of her jugular vein.  The victim's face and eyes were bruised and swollen.  The victim's legs were spread open and her body had a petroleum-like odor.  A blue soapy liquid was found in her vagina, along with semen.  Two bloody handprints were found on the floor, one on each side of the body; and the walls and floor of the victim's bedroom had blood spatters and stains suggestive of a struggle occurring on the floor.

A police officer who was called to the scene inspected the contents of a garbage dumpster outside the victim's apartment and found bloody socks, a canister of lighter fluid, a bottle of cleaning solution, and bloody bed linens—all of which were collected for testing.  While the police were processing the crime scene and gathering information by talking to the victim's friends and neighbors, Reginald Span and his wife Dorothy, family friends of the victim who had received a telephone call regarding the victim's demise, drove to

the crime scene and approached the police. Dorothy's brother-in-law, John Lee Hampton (the defendant), a thirty-three-year-old man who had recently moved from Georgia into the Span household, had come with the Spans to the crime scene at Dorothy's insistence. Although the Spans immediately approached the police, Hampton indicated he was "not going up there," and walked to another part of the apartment complex to avoid the police.

Unbeknownst to Dorothy Span, her husband Reginald was having a romantic affair with the victim. And, on the previous evening into the early morning hours, Reginald, the victim, Hampton, and a female friend of the victim were at the victim's apartment drinking gin and playing cards. Although Reginald Span knew that his story would not help his marriage, he told the police and his wife about the "card party" at the victim's apartment. Upon hearing her husband's version of events, Dorothy Span set out to find Hampton to encourage him to talk to the police. The lead detective from the Clearwater Police Department spoke to Hampton at the crime scene, and he noticed that Hampton was not wearing socks. The detective also noticed that Hampton had what appeared to be dried blood on his feet, pants, and his necklace. . . .

. . . .

. . . Testimony introduced at trial established that none of the physical evidence that was collected linked Reginald Span to the murder of the victim.

## Hampton's Post-<u>Miranda</u> Statement

At the Clearwater Police Department, Hampton was photographed and swabs were taken from his feet, pants, and his necklace for DNA testing. Other than a small scrape on Hampton's right foot, he had no injuries. After waiving his <u>Miranda</u>[1] rights, Hampton gave a two-hour videotaped statement to the police. During his post-<u>Miranda</u> statement, Hampton relayed at least eight different descriptions of what occurred in the early morning hours preceding the victim's death. . . .

---

1. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

In his first account of the events, Hampton told police that once he arrived at the Span residence in the early morning hours, he went inside, drank a beer, and went to sleep in a chair downstairs. After further questioning, Hampton then relayed another version of the events, one that indirectly implicated Reginald Span as the individual who might have harmed the victim. In this narrative, Hampton stated that he "dozed off" at the victim's apartment after playing cards, and was awakened by Reginald Span who declared it was time to go home. Hampton recounted that he saw the victim lying on the floor, and that he tried to help her by performing CPR on her. Hampton reported that this was how his socks became saturated with the victim's blood. In this version of the events, Reginald Span and Hampton then went back to the Span residence at 3 a.m. and went to sleep. While relaying this story, Hampton twice told the detectives that he did not have sex with the victim.

After further questioning by police, Hampton provided numerous additional narratives wherein he and the victim had sexual intercourse and he thereafter killed the victim. In each of the varying descriptions of his sexual encounter with the victim, Hampton reported that at some time during or after the sexual event, the victim attacked him with a knife, and that his act of killing the victim was in self-defense or accidental. In his final version of the events leading up to the victim's death, Hampton stated that he and Reginald Span left the victim's apartment at approximately 3 a.m., and after they arrived at the Span residence, Hampton did not go inside, but rather returned alone to the victim's apartment. Hampton recounted that upon his return to the victim's apartment, he had sex with her, she fell asleep, and he then attempted to steal money or drugs from her. According to Hampton, the victim caught Hampton riffling through her drawers, and in response to her attempt to stop him, he killed her with a knife. In this version of the story—consistent with the testimony of Reginald and Dorothy Span—Hampton returned to the Span residence when it was light outside. Hampton also admitted to using a rag, cleaning solution, and lighter fluid to try to clean his semen from the victim's vagina. Nevertheless, he insisted that his sexual encounter with the victim was consensual. Hampton also admitted to throwing his bloody socks, the bloody bed linens, and the cleaning solution in the dumpster near the victim's apartment. Upon further questioning, Hampton told police that Reginald Span was not involved in the victim's death, and that Span was not at the victim's

apartment when Hampton killed her.  Based on the evidence collected by the Clearwater Police Department, Hampton was charged on a single count of first-degree murder.  Hampton pled not guilty.

## The Trial

. . . After the jury was empaneled and sworn, the State introduced the testimony of Reginald and Dorothy Span, the detectives who processed the crime scene, forensic experts, and other witnesses who observed the crime scene and confirmed the occurrence of the card party. . . .  A DNA analyst testified that the substance found on Hampton's pants, feet, and necklace was the victim's blood, and that Hampton's semen was found inside the victim's vagina. . . .  During its case-in-chief, the State played the video of Hampton's post-Miranda statement, wherein he admitted numerous times to killing the victim in the early morning hours of June 10, 2007.

After the State rested its case-in-chief, Hampton testified on his own behalf.  He testified that he did not kill, harm, or steal from the victim, and his post-Miranda confessions admitting as much were lies.  At trial, Hampton furnished a new narrative regarding his sexual encounter with the victim, one that differed from the various accounts furnished to the police in his post-Miranda statement.  According to Hampton's trial testimony, at some point during the card party Reginald Span stepped outside of the victim's apartment to make a series of telephone calls, and during this time, Hampton and the victim had consensual sex in the victim's bedroom.  Hampton testified that Reginald Span then came back into the victim's apartment, and Hampton fell asleep on a sofa.  According to Hampton, he was later awakened by Reginald Span who said it was time to go home.  Hampton saw the victim lying on the floor wounded and he tried to help her, but his efforts were thwarted by Span.  According to Hampton, he noticed the blood on his socks, removed them, and threw them into a plastic trash can, which he then threw into the dumpster.  Thereafter, according to Hampton's trial testimony, he and Reginald drove back to the Spans' apartment, where they each drank a beer and went to sleep.  At trial, Hampton stated that the reason he told the police in his post-Miranda statement that he killed the victim was because he had told the police the truth at first, but grew tired of answering questions.

- 5 -

On cross-examination at trial, Hampton testified that he had previously been convicted of four felonies, including a conviction for a crime involving dishonesty, and that he was on felony probation at the time of the victim's death. . . . Hampton admitted that consistent with his post-Miranda statement, he indeed attempted to remove his semen from inside the victim's vagina with a rag and cleaning solutions. He testified that he did this while the victim was gasping for air and pleading for help. . . .

. . . After deliberation, the jury unanimously reached a guilty verdict on the charge of first-degree murder, the only charge filed against Hampton. . . .

. . . On June 25, 2009, the jury made a recommendation of death by a vote of nine to three . . . .

Hampton v. State, 103 So. 3d 98, 103-07 (Fla. 2012).

After conducting a Spencer[2] hearing, the trial court entered a sentencing order following the jury's recommendation and imposing the death penalty. The court found three aggravating circumstances, each of which was afforded great weight: (1) the murder was committed by a person previously convicted of a felony and on probation; (2) the murder was committed during the commission of a robbery, sexual battery, and burglary; and (3) the murder was especially heinous, atrocious, or cruel (HAC). Id. at 108. Regarding mitigation, the trial court found that while Hampton had "mental health issues," he failed to establish statutory mental mitigation. However, his mental health issues were considered nonstatutory mitigation and afforded little weight. Id. at 108-09. In addition, the

_____

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

court found Hampton established the following six nonstatutory mitigators, each of which was afforded little weight: (1) Hampton was neglected during his childhood; (2) Hampton was physically abused by his stepfather during his childhood; (3) Hampton was abandoned by his parents and was raised poorly; (4) Hampton has a family that cares about him; (5) Hampton has an exemplary discipline record in jail and displayed model behavior during his week-long trial; and (6) the nonunanimous (nine to three) jury verdict. Id. at 109. The trial court found the aggravating factors were "horrendous" and greatly outweighed the "comparatively insignificant mitigating factors," and therefore the death penalty was appropriate and proportional. Id.

## Direct Appeal Proceedings

Hampton raised five issues on direct appeal: (1) whether the trial court erred in denying Hampton's requests for a juror interview or a new trial based on the assertion that one member of the jury was "under prosecution" while serving; (2) whether the trial court erred when it instructed the jury that it could find Hampton committed first-degree felony murder based on the commission of the underlying felony of sexual battery; (3) whether the trial court erred in allowing the introduction of certain autopsy photographs; (4) whether Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584 (2002); and (5) whether the trial court erred in rejecting the testimony of forensic psychologist Dr. Robert

Berland, introduced during the Spencer hearing. This Court rejected all claims and affirmed Hampton's conviction and sentence. Hampton, 103 So. 3d at 122.

**Postconviction Proceedings**

In April 2014, Hampton timely filed a Motion to Vacate Judgment of Conviction and Sentence pursuant to Florida Rule of Criminal Procedure 3.851. In his motion, Hampton raised six claims: (1)(a) Hampton was not competent to stand trial, (b) trial counsel should not have stipulated to the expert's finding that he was competent, and (c) trial counsel should have requested a third "tiebreaker" expert regarding competence; (2) Hampton is intellectually disabled, prohibiting imposition of the death penalty, and trial counsel were ineffective for failing to raise this claim; (3) trial counsel were ineffective for (a) failing to prepare Hampton to testify, (b) allowing the State to present evidence that Hampton had an active warrant, (c) failing to move to redact portions of Hampton's video interrogation, and (d) allowing improper victim impact testimony without a proper limiting instruction; (4) trial counsel were ineffective during the penalty phase for failing to investigate, develop, and present mitigation regarding the underlying causes of Hampton's drug abuse and bad behavior; (5) trial counsel were ineffective during the penalty phase for not presenting the testimony of Dr. Robert Berland to the jury, and for failing to present evidence of Hampton's brain injury; and (6) cumulative error.

An evidentiary hearing was granted on all claims. Fourteen witnesses testified, including Hampton's trial counsel, Randall Lane Lastinger and Richard Watts,[3] several medical experts, and family members.

Following the evidentiary hearing, the postconviction court entered an order denying all claims. Hampton appeals the denial of his motion, raising five issues: (1) whether trial counsel were ineffective for stipulating to Hampton's competency to stand trial and failing to obtain an additional competency evaluation; (2) whether trial counsel were ineffective for allowing the State to present evidence of Hampton's outstanding warrant, failing to redact portions of the videotaped interrogation, and allowing improper victim impact evidence; (3) whether trial counsel were ineffective for failing to fully investigate and present mitigation; (4) whether trial counsel were ineffective for failing to present mental health mitigation to the jury and for failing to obtain a positron emission tomography (PET) scan; and (5) whether Hampton is intellectually disabled, and whether trial counsel were ineffective for failing to raise this claim.

Hampton also filed a petition for writ of habeas corpus with this Court in which he raised the following claims: (1) whether appellate counsel was ineffective

3. Attorney Lastinger was Hampton's lead guilt phase counsel, and attorney Watts was Hampton's lead penalty phase counsel. However, the record indicates that Watts also assisted with portions of the guilt phase and vice versa. For this reason, Lastinger and Watts will collectively be referred to as "trial counsel."

for failing to challenge Florida's capital punishment scheme on grounds that it violates the Eighth Amendment; (2) whether Hampton's sentence is unconstitutional under Hurst; and (3) whether the execution of Hampton would violate the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment because Hampton is mentally ill.

## ANALYSIS

### I.  Ineffective Assistance of Counsel

A defendant alleging ineffective assistance of counsel must prove: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the defendant.  See Strickland v. Washington, 466 U.S. 668 (1984); see also Rutherford v. State, 727 So. 2d 216 (Fla. 1998).  If the defendant fails to establish prejudice, the reviewing court need not make a specific ruling regarding deficiency.  See Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010).

To establish deficiency, the defendant must show a specific act or omission by counsel that falls below an objective standard of reasonableness under prevailing professional norms.  Francois v. State, 423 So. 2d 357, 359 (Fla. 1982).  The act or omission must constitute an error "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  Strickland, 466 U.S. at 687.  However, there is a strong presumption that trial counsel's performance was not ineffective, and "[j]udicial scrutiny of counsel's performance

- 10 -

must be highly deferential." Id. at 689. We have held "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhiocone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Therefore, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

To establish prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. Mere speculation is not sufficient to form the basis for postconviction relief. See Derrick v. State, 983 So. 2d 443, 462 (Fla. 2008) ("[I]n order to sufficiently undermine this Court's confidence in the outcome of resentencing, [the defendant] must rely on more than mere speculation."); see also

Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000) ("Postconviction relief cannot be based on speculation or possibility.").

When reviewing a postconviction court's ruling on an ineffectiveness claim, this Court employs a mixed standard of review, deferring to the trial court's findings on factual issues that are supported by competent, substantial evidence, and reviewing the trial court's legal conclusions de novo. Bruno v. State, 807 So. 2d 55, 62 (Fla. 2001).

## A. Competency

Hampton argues that trial counsel were ineffective for stipulating to the finding of Dr. Darren Rothschild that Hampton was competent to stand trial, and for failing to request that another mental health expert evaluate Hampton for competency. However, we agree with the postconviction court's conclusion that trial counsel were not ineffective.

In determining whether a defendant is competent to proceed, a court must consider whether he "has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational, as well as a factual, understanding of the pending proceedings." Fla. R. Crim. P. 3.211(a)(1).

Hampton was evaluated for competency three times: twice before trial and once prior to the Spencer hearing. Hampton was first evaluated by Dr. Robert

Berland, a forensic psychologist retained by the defense, who concluded Hampton was not competent to proceed. In reaching his conclusion, Dr. Berland relied on data from the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2) test that he administered to Hampton just days after the murder, two interviews with Hampton, and Hampton's medical, school, and prison records. Dr. Berland determined Hampton was unable to consult with his attorneys with a reasonable degree of rational understanding, had unrealistic expectations regarding the outcome of his trial, and lacked a rational appreciation of the nature of the proceedings against him.

Trial counsel subsequently moved for the court to appoint an expert to examine Hampton for competency. Co-counsel Watts later testified during the postconviction evidentiary hearing that he wanted another expert to evaluate Hampton primarily because trial counsel's own experiences in dealing with Hampton were inconsistent with what Dr. Berland described in his report. In response to the motion, the court appointed a psychiatrist, Dr. Rothschild, to examine Hampton. After conducting a four-hour clinical interview and administering psychological testing, Dr. Rothschild concluded Hampton was competent to stand trial. Dr. Rothschild detailed his findings in an extensive report that stated, "Hampton was feigning and/or exaggerating symptoms of psychosis, particularly after he realized that if he was found incompetent, he could not stand

trial.  Nonetheless, he demonstrated sufficient appreciation of the charge against him, along with an adequate awareness of the range and nature of potential consequences for this charge."

Finally, Hampton was evaluated for competency a third time prior to the Spencer hearing by a psychologist, Dr. Jill Poorman, who concluded Hampton was competent to proceed.

When considering this claim, the postconviction court rejected Hampton's assertion that trial counsel should not have stipulated to the competency finding of Dr. Rothschild and instead should have requested an additional "tiebreaker" expert to evaluate him.  The record includes competent, substantial evidence to support this conclusion.  Trial counsel indicated during the evidentiary hearing that their own experiences interacting with Hampton were inconsistent with Dr. Berland's findings.  Counsel testified they did not have any difficulty communicating with Hampton, and Hampton had no difficulty assisting counsel in preparing for trial.  Counsel also testified that they knew Dr. Berland's reputation for being friendly to the defense, and they sought the advice of a psychiatrist who did not have such a reputation and who would conduct an objective evaluation of Hampton.  That psychiatrist, Dr. Rothschild, concluded Hampton was competent, and trial counsel testified during the evidentiary hearing that Dr. Rothschild's findings were entirely consistent with their own observations of Hampton.  Counsel did not have

- 14 -

reasonable grounds to further question Hampton's competency, and therefore we agree with the postconviction court that they were not deficient for failing to pursue this claim.

Even if trial counsel were deficient, Hampton has failed to establish prejudice. As the postconviction court explained:

> [A]lthough Hampton argues that a "tiebreaker" expert would have reconciled the conflict between Dr. Berland's incompetency finding, and Dr. Rothschild's competency finding, . . . the record reflects that a third mental health expert did evaluate Hampton. Dr. Poorman testified at the evidentiary hearing that she evaluated Hampton prior to the Spencer hearing and found him to be competent to proceed. Therefore, Hampton merely speculates that had Dr. Poorman or another mental health expert evaluated him prior to trial, that their finding would be an incompetency finding. This claim is wholly speculative and not supported by the record before the court.

We agree. As previously discussed, mere speculation is insufficient to establish prejudice. See Derrick, 983 So. 2d 443. Accordingly, we affirm the postconviction court's holding that trial counsel were not ineffective.

## B. Videotaped Interrogation

During the State's case-in-chief, a videotape of Hampton's interrogation by law enforcement was presented to the jury. During the interrogation, Hampton twice mentioned he had an outstanding warrant. Hampton argues trial counsel were ineffective for failing to object to the presentation of this evidence because allowing the jury to hear about the outstanding warrant cast him in a negative light. Hampton also contends trial counsel should have objected when the trial court

- 15 -

precluded counsel from speaking with Hampton during a recess while his warrant and prior felonies were being discussed. Hampton further asserts trial counsel were ineffective for failing to redact other portions of the videotape on the basis that it contained allegedly inflammatory statements by detectives. We address each contention in turn.

### 1. Reference to Outstanding Warrant

During the postconviction evidentiary hearing, attorney Lastinger testified that, although he could not recall, he believed leaving in the reference to the warrant in the videotaped interrogation was strategic: the existence of a warrant explained why Hampton avoided the police at the crime scene. Lastinger also testified that the fact that the warrant is referenced twice in the video led him to believe it was intentionally left in. Based on this testimony, the postconviction court found the "reference to the warrant was strategically left in the videotape to explain Hampton's reluctance to speak with police," and "[i]t also explained Hampton's failure to render aid to the victim." The court determined that "[u]nder the circumstances it was reasonable to allow some testimony to explain why Hampton was avoiding the police other than consciousness of guilt." The court also found "Hampton's brief reference to the warrant did not prejudice the defense," because "[f]ailure to assist the victim to avoid arrest is callous but much

- 16 -

less so than leaving the jury with the assumption that Hampton wanted the victim to die so she could not identify him."

However, the postconviction court's conclusion as to deficiency is undermined by the discussion between the court, the State, and Hampton's counsel after Hampton mentioned the warrant again while testifying at trial. Outside the presence of the jury, co-counsel Lastinger expressed concern that, because Hampton placed the existence of the warrant at issue, it would open the door for the State to question the grounds for the warrant. During the subsequent recess, the State and defense counsel reached a compromise limiting the State's questions regarding the warrant.

If trial counsel intended for the jury to learn about Hampton's warrant through the videotape, they would not have been caught off guard when Hampton mentioned the warrant again while testifying. Conceivably, they would have discussed the issue with the State and reached a compromise before the videotape was introduced, particularly because the State performed the actual redactions. At no time during the discussion between the court, the State, and the defense did counsel mention their now-asserted rationale for wanting the jury to know about the warrant, namely, to explain why Hampton avoided the police. No one mentioned that the jury had been made aware of the warrant by way of the videotape. Although Lastinger testified that, in hindsight, it was likely a strategic

- 17 -

decision to keep the reference in the videotape, he also testified it may have been a mistake on his part. The facts suggest it was the latter.[4] Therefore, the record does not support the postconviction court's conclusion that trial counsel were not deficient for failure to redact Hampton's reference to the warrant from the videotape.

Nevertheless, Hampton has failed to establish prejudice. Even if the jury had not learned of Hampton's warrant from the videotape, they still would have learned about it from Hampton himself when he mentioned it while testifying. Moreover, even if the jury never learned of the warrant, they still would have heard the overwhelming evidence of Hampton's guilt, including his own statements to law enforcement, DNA evidence, and witness testimony. Further, although the mere existence of a warrant could have possibly cast Hampton in a negative light, the jury never heard the underlying grounds for the warrant, namely, because Hampton failed to register as a sex offender. Therefore, we conclude there is no

---

4. Our conclusion is bolstered by the fact that reference to the warrant was redacted at least twice from the videotape. In the transcript of the unedited version, the detective begins questioning Hampton by asking, "Mr. Hampton, you're aware you had a warrant out of Georgia, correct? Okay, so technically you're in custody for a warrant so I gotta read you your Miranda because you're in custody for a warrant, okay?" After reading Hampton his rights, the detective continues, "And you understand I'm not going to talk about anything that has to do with your warrant." The version shown to the jury does not include these references to Hampton's warrant.

reasonable probability the outcome of the trial would have been different if the jury did not learn of Hampton's warrant. Our confidence in the outcome has not been undermined. See Strickland, 466 U.S. at 694.

## 2. Failure to Request Opportunity to Consult with Hampton During Recess

Shortly after Hampton mentioned the warrant during trial, and outside the presence of the jury, defense counsel Lastinger expressed concern that Hampton's testimony had opened the door for the State to ask Hampton about the basis for the warrant. The trial court stated it would take a recess, and if the parties wished, the court would hear arguments on the subject after recess. The court added, "The Defendant is on the stand. He is not to talk to any attorney." Upon return from recess, and in Hampton's presence, Lastinger informed the court that the parties had reached a compromise regarding how the State would limit its questioning in order to avoid bringing up Hampton's sex offender status: on cross-examination, the State would first ask Hampton if he had ever been convicted of a felony, and if so, how many times. The State would then ask if he was on probation for one of those felonies at the time of the murder, and if the outstanding warrant Hampton previously mentioned was due to being in violation of that probation. However, when cross-examination commenced, Hampton initially answered inaccurately that he had only been convicted of one felony, rather than four.

Hampton argues the trial court erred in precluding trial counsel from speaking with him during the recess, and trial counsel were ineffective for failing to object to this alleged bar on consultation. According to Hampton, he would not have answered the State's question incorrectly if he had been able to consult with counsel during the recess. The postconviction court rejected this claim, and found trial counsel did not ask to consult with Hampton during the recess because they needed the time to meet with the State to ensure it did not reveal that Hampton was a registered sex offender. The postconviction court concluded this was a reasonable strategy. We agree.

Hampton asserts that his case is like Thompson v. State, 507 So. 2d 1074, 1074 (Fla. 1987), where this Court granted a new trial because "the court precluded the defendant from consulting with his counsel during recess." However, this case is distinguishable. In Thompson, the State "was granted a thirty-minute recess for the sole purpose of researching ways to impeach [Thompson] regarding a subsequent arrest which his lawyer had apparently advised him would be inadmissible. Thus, Thompson was denied the guidance and support of his attorney when he needed it most (i.e., when the State was preparing for a major attack on his credibility)." Id. at 1075. This Court determined that Thompson's credibility was a crucial issue, and denial of consultation with counsel left Thompson nervous and confused. Id.

- 20 -

Here, unlike the defendant in <u>Thompson</u>, there was no indication that Hampton was nervous or confused.  Moreover, in <u>Thompson</u>, the court denied defense counsel's request to consult with Thompson during recess.  <u>Id.</u> at 1074. Here, trial counsel never requested to speak with Hampton during the recess because, as co-counsel Lastinger testified during the evidentiary hearing, the primary concern was reaching an agreement with the State that would avoid discussion of Hampton's sex offender status.  The postconviction court determined this strategy "minimized the effect of Hampton's unexpected testimony."  Given the circumstances, we conclude it was reasonable for trial counsel to use the recess to prevent potentially damaging cross-examination.

We further conclude Hampton cannot establish prejudice.  Prior to cross-examination, trial counsel explained to the court the compromise reached with the State and announced the correct number of prior convictions <u>in Hampton's presence</u>.  It is purely speculative that Hampton's incorrect testimony as to his number of convictions would have been any different had his counsel consulted with him during the recess.  Therefore, Hampton's trial counsel were not ineffective.

### 3.  Alleged Prejudicial Statements in Videotaped Interrogation

The videotape of Hampton's interrogation contained several statements by detectives describing the murder, the victim, and the impact the murder had on the

victim's children.  Hampton argues these comments should have been redacted and

counsel were ineffective for failing to do so.  Below is a summary of the relevant

statements the jury heard during the guilt phase.

(1) Comments regarding the victim's children and suggesting Hampton

thought the murder was funny:

> We've got a family out there and we got people that want some
> answers here, okay, especially those little girls.  Those little precious
> girls that that girl that you killed gave birth to, okay? . . .  Those little
> girls now who don't have a mom because their mom is laying in that
> bedroom hacked up. . . .  Do the right thing here, and let's come clean
> with what's going on, so I can give this family some answers.  You'd
> want me to do the same with your children, if something happened to
> you, wouldn't you? . . .  You hacked the shit out of this girl, okay, and
> you left her there and you left blood all over that place. . . .  Don't
> laugh because this isn't a laughing matter, man.  This is serious shit.

(2) Additional comments regarding the victim's family and urging Hampton

to confess:

> When are you going to drop all this other stuff and just come
> completely clean?  Do the right thing.  Think of her kids, think of her
> family, okay? . . .  John, the family, the girls, what do I tell them,
> man?  What do I freaking tell them? . . .  Wouldn't you rather me go
> back to them when the day comes . . . and say, you know what, he told
> me what really happened, he was sorry, he feels horrible for what he
> did. . . .  These little girls are going to grow up someday, John.  They
> need to know the answers.  The truth. . . .  Where did you put that
> knife?  Let us find it, so those little girls don't think there's some little
> weapon flying around that's going to hurt them. . . .  I need to know so
> that I can tell those little girls the truth. . . .  [W]e want to be able to
> give these little girls some clear-cut answers, all right? . . .  What do

you want me to tell Peanut's[5] family?  What do you want me to tell her daughters? . . .  What about if her kids were sitting in here right now, what would you say to them?  What would I tell those precious little girls?  Especially that little one who was tugging on my leg this morning right there at the crime scene.  Saying, hello to me.  Saying, Hi Mr. Police.  Having no idea that her mom was dead laying in a puddle of blood. . . .  What would you tell her? . . .  You can't think of one thing you would tell her?  How about maybe, I'm sorry for what happened. . . . Your mom isn't supposed to be dead right now.  I'm sorry.

(3) Suggesting the jury would view Hampton as a monster: "Do you want to

be made out to be a complete monster in the courtroom when this . . . trial comes

up?"

(4) Detectives' comments following Hampton's repeated denials of rape:

You already committed a much bigger crime than rape. . . . [If] you hide it from us . . . then it's going to make you look like a bad guy. . . . Do you want to have us go up in front of a judge and say look, John made a mistake.  He was honest with us.  Or do you want us to have us go, John said he didn't rape her.  Here's the crime scene photos, Your Honor.  Here's the results of the medical examiner's inspection of her vagina.  Here's where those tears and rips in her vagina showing that there was forcible sex.  That's only going to make you look like a liar.

(5) Suggesting Hampton intended to burn the victim's body:

It sounds to me like you were getting ready to light the match. . . .  So you want me to believe that you just poured lighter fluid on her to clean her off when you had cleaning stuff there, too?  It's just not adding up.  I think you were really in a panic mode and you were probably going to light the place up to cover your tracks. . . .  But you know what, I think about it, John, and I say, maybe this cat does have

---

5.  The victim's family and friends called her by the nickname Peanut.

a conscience. He was probably getting ready to throw the match and then he said, I can't do this. I can't take it that far, and that's when you pulled out the cleaning stuff. I'm wondering. You know what I mean? Because you're not a dumb guy, lighter fluid doesn't really clean anything.

(6) Suggesting witness elimination as a motive: "She was stabbed so many times she was bleeding like a stuffed [sic] pig. And she was screaming and she was fighting and you had to silence her because the neighbors were going to hear and your ass was going to be in trouble, right?"

(7) Suggesting Hampton had sex with the victim after she died: "You had sex with her after she was dead, didn't you?"

The postconviction court determined trial counsel were not deficient, concluding:

> The comments by police during the two-hour long videotaped confession showed how police were treating Hampton, how they were interrogating him, and the pressure they were exerting to elicit a confession. This was supported by Hampton's own testimony. In addition, trial counsel used the detective's misrepresentations and pressure to show that law enforcement neglected to fully investigate [Reginald Span] as a suspect.

The court also held Hampton was not prejudiced as a result of the comments:

> Hampton's confession was a difficult thing for the defense to overcome because it contained several different stories and was filled with prejudicial statements that could not necessarily be excluded. There was overwhelming evidence of Hampton's guilt in this case including witness testimony, Hampton's DNA inside the victim, the victim's DNA on Hampton and his clothes, Hampton's effort to cover up the crime by cleaning the victim's vagina and throwing away evidence, Hampton's fingerprints at the scene, and Hampton's

> admissions to police. Considering the comments in the context of the positive effects and the overwhelming evidence of Hampton's guilt, the court finds that there is no reasonable probability of a different outcome had the comments been removed.

We agree. Trial counsel were in the difficult position of having to explain Hampton's confession. They hired and consulted with an expert in false confessions, but the expert was unable to find evidence of coercion during Hampton's interrogation. Co-counsel Lastinger explained during the evidentiary hearing that the detectives' remarks were not redacted in order to explain why Hampton kept changing his story: the detectives' comments showed how Hampton was being treated, and why he may have felt pressured to keep coming up with new facts or explanations. Indeed, Hampton testified on the stand that he told multiple versions of the events because he was tired of being questioned. This was reiterated in the defense's closing statement where Lastinger contended detectives immediately focused on Hampton without fully investigating Reginald Span. As a result, Hampton "start[ed] saying anything to get out of there," and "as [the detectives] pushed and . . . pushed, [Hampton] changed his story." Further, Lastinger explained that Hampton's defense was he did not commit the murder, suggesting Span did instead. Thus, comments regarding the condition of the victim's body (e.g., "bleeding like a stuck pig") did not bear on Hampton's guilt. Lastinger also testified they did not redact the detective's comments about setting the victim on fire because, other than the lighter fluid, there was no other evidence

to suggest this was what Hampton was trying to do.[6]  According to Lastinger, the statements demonstrated that the detectives were overreaching and jumping to conclusions to provide an explanation for Hampton's actions.

In sum, trial counsel needed to explain to the jury why Hampton confessed and why his statements to the police were wildly inconsistent.  Although the detectives' statements are troubling, counsel's strategy of showing the detectives' high-pressure tactics was reasonable in light of the difficult circumstances presented in this case.  Therefore, because counsel's "decision was reasonable under the norms of professional conduct," Occhiocone, 768 So. 2d at 1048, we conclude Hampton has failed to establish deficiency.

However, even if trial counsel were deficient, Hampton has failed to establish a reasonable probability that the comments in the videotape affected the outcome of the trial.  As the postconviction court noted, the evidence of Hampton's guilt is overwhelming.  Even if the videotape had been shown to the jury with the allegedly inflammatory comments redacted, the jury still heard about the nature and extent of the victim's injuries through the forensic evidence presented during trial, crime scene and autopsy photographs, and Hampton's own testimony during trial about how he poured chemicals on the victim while she was gasping for

---

6. For example, no matches or lighters were found at the scene.

breath and begging for help.  See Hampton, 103 So. 3d at 115.  Therefore, we affirm the denial of relief on this claim.

## II. Intellectual Disability

Hampton challenges the postconviction court's determination that he is not intellectually disabled and trial counsel were not ineffective for failure to raise intellectual disability as a bar to execution.

To prove intellectual disability, a defendant must demonstrate: (1) significantly sub-average general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition prior to age eighteen.  § 921.137(1), Fla. Stat. (2016).  Significantly sub-average general intellectual functioning is defined as "two or more standard deviations from the mean score on a standardized intelligence test."  Id.  In addition, the standard error of measurement must be taken into account when reviewing intellectual disability claims.  Hall v. Florida, 134 S. Ct. 1986, 2001 (2014).  In other words, when a defendant's IQ score is 75 or below, he must be given the opportunity to present evidence of intellectual disability, "including deficits in adaptive functioning over his lifetime."  Id.

Regarding the second prong, the term adaptive behavior "means the effectiveness or degree with which an individual meets the standards of personal

independence and social responsibility expected of his or her age, cultural group, and community." § 921.137(1), Fla. Stat.

In reviewing claims of intellectual disability, the standard of review is whether competent, substantial evidence supports the trial court's determination. See Johnston v. State, 960 So. 2d 757, 761 (Fla. 2006).

## A. Sub-Average Intellectual Functioning

The evidence presented during the postconviction evidentiary hearing revealed Hampton was administered four separate IQ tests throughout his life. Two of those were of the type that are approved for purposes of diagnosing intellectual disability: a Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) in 2013 in which Hampton received a score of 71, and another WAIS in 1989, in which Hampton received a score of 78.[7]

Of the four IQ tests Hampton was administered, only one had an unadjusted score that fell within the standard error of measurement (i.e., below 75). Notably, this test was administered in preparation for postconviction proceedings, and

---

7. The other two tests—the Slosson Intelligence Test (SIT) and the Culture Fair Intelligence Test (CFIT)—are narrow-band IQ tests that are not approved to diagnose intellectual disability; rather, they are primarily used to identify individuals in need of more intensive evaluation. The SIT was administered in 1983, and he achieved a score of 115. The CFIT was administered in 1993, and he received a score of 89. These unapproved tests do not bear upon our decision regarding Hampton's intellectual disability.

testimony was presented that the test's raw data indicated Hampton was malingering. In fact, State expert Dr. Michael Gamache, a clinical psychologist and neuropsychologist, testified during the evidentiary hearing that at least three other independent sources of information raised a concern about malingering. First, Dr. Gamache testified that Dr. Joseph Sesta (who administered Hampton's 2013 WAIS-IV test) used six measures of premorbid intellectual ability,[8] and all the measures indicated Hampton's actual IQ falls within the range of 75-88. Dr. Gamache found the significant difference between the IQ score of 71 and the premorbid scores to be suspicious, and concluded Hampton's premorbid scores within the 75-88 range correspond with his actual IQ.

Second, Dr. Gamache testified that Hampton's responses on the MMPI-2, administered by Dr. Berland during his competency evaluation, showed evidence of malingering. Dr. Gamache explained that the MMPI-2 contains built-in "validity scales" which are used to analyze, among other things, whether the test-taker is over-reporting symptoms in a way that is atypical of someone with genuine mental illness. Dr. Gamache testified that Hampton's scores on one of these scales was five standard deviations above the mean and strongly associated with a person

---

8. A premorbid IQ score is calculated based on records, formulas, or tests, and is then compared with a current IQ score to gauge whether the IQ has potentially declined due to a neurological problem or disease. A premorbid IQ allows for the quantification of the cognitive impact of an injury.

who is either faking mental illness or answering the questions randomly.

Dr. Gamache concluded the score rendered the test invalid and meaningless.

Finally, Dr. Gamache noted that Hampton's jail records also showed evidence of malingering.

Dr. Gamache found Dr. Rothschild's findings of malingering to be significant. As previously discussed, Dr. Rothschild was appointed by the court to evaluate Hampton for competency prior to trial. As a part of his evaluation, Dr. Rothschild administered the Structured Interview of Reported Symptoms (SIRS). Dr. Rothschild found that Hampton's "markedly elevated scores are characteristic of individuals who are feigning a mental disorder and are rarely seen in individuals who are responding truthfully. Based on the SIRS, the predicted probability of dishonest responding regarding psychotic symptoms was greater than 99.9% and the likelihood of honest responding was less than 0.01%." Dr. Rothschild also found the "[e]vidence of malingering . . . was more apparent toward the end of the evaluation (i.e., with the SIRS), after Mr. Hampton learned that, if found incompetent, he would not stand trial."

Regarding the score of 78 on the WAIS administered in 1983, Hampton argues it should be adjusted for the Flynn effect[9] and discounted because he was

---

9. "The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby

not administered the version appropriate for his age. However, testimony was presented during the evidentiary hearing that adjusting for the Flynn effect is controversial and not routinely applied in a clinical setting; even defense expert Dr. Mark Douglas Cunningham conceded as much. Moreover, according to Dr. Gamache, Hampton would have scored even higher had he been administered the correct version of the WAIS for his age.

The postconviction court acknowledged there was conflicting testimony regarding Hampton's actual IQ score. However, as Dr. Gamache explained, while it is possible for someone to feign intellectual impairment, it is not possible to "fake being smarter." Based on the foregoing, there is competent, substantial evidence to support the postconviction court's conclusion that Hampton did not establish significantly sub-average general intellectual functioning.

### B. Concurrent Deficits in Adaptive Functioning

As the postconviction court found, the "evaluation of Hampton's skills in the community after age eighteen is complicated by his being in prison for all but three years of his adulthood." Nevertheless, the postconviction court concluded that

---

artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field." Thomas v. Allen, 607 F.3d 749, 753 (11th Cir. 2010).

Hampton had failed to establish concurrent deficits in adaptive functioning.  We agree.

According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which Dr. Cunningham utilized in his evaluation of Hampton, a diagnosis of intellectual disability requires that the individual exhibit "impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013).  There are three domains of adaptive functioning: (1) conceptual (or academic), involving "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations"; (2) social, involving "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment"; and (3) practical, involving "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization."  Id. at 37.  The deficits "must be directly related to the intellectual impairments" associated with the first prong; namely, "reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding."  Id. at 37-38.  The diagnostic requirements of the

second prong are met when at least one of these domains "is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." Id. at 38.

As Dr. Cunningham explained, "Deficient adaptive functioning doesn't mean devoid; . . . substantial deficits are not required in all arenas, only some arenas; . . . this is a diagnosis that's made based on the presence of limitations and is not contraindicated by the presence of the strengths." However, only minimal evidence was presented regarding the existence of such limitations. Regarding deficits in conceptual skills, evidence was presented that Hampton's wife Paula would read restaurant menus to him, fill out his job applications, and read letters and other correspondence to him.

Regarding deficits in social skills, evidence was presented that Hampton had few friends and was generally untrusting of others. Dr. Cunningham testified he had difficulty communicating with Hampton: he often answered questions impulsively, and obtaining simple information from Hampton sometimes necessitated that a question be asked multiple times. Regarding deficits in practical skills, evidence was presented that Hampton never lived autonomously; he lived with family or romantic partners instead. Hampton did not have a bank account and did not handle the family finances. Although he knew how to drive, he did not obtain a driver license. He did not use public transportation as a part of

his daily routine, and often relied on others for rides. According to Paula, Hampton did not always consider the long-term consequences of his decisions, exemplified, for instance, by his failure to turn himself in to authorities in Georgia for his outstanding warrant and failure to disclose to Paula his status as a sex offender.

However, these alleged deficits should be viewed in light of the fact that Hampton spent all but three years of his adulthood in prison, conceivably making it more difficult to reach a level of personal independence normally expected in the community. Moreover, the record does not reflect Hampton was <u>incapable</u> of performing many of the tasks he now presents as deficits; rather, it could have been a lifestyle choice or personal preference. For example, there is no evidence that Hampton was unable to read restaurant menus, fill out job applications, or read correspondence; Paula testified she did these things for him because he was her husband and he asked her to. Similarly, there was no evidence Hampton was incapable of opening a bank account or handling the family finances; these were just things Paula took care of. Likewise, there is no indication that Hampton would have been incapable of living alone if he had chosen to do so. In addition, the purported existence of deficits in communication is undermined by conflicting testimony: while Dr. Cunningham opined that he had difficulty communicating with Hampton, Paula and other family members testified to the exact opposite.

Overall, there is no indication that Hampton's adaptive functioning is so "sufficiently impaired that ongoing support is needed in order for [him] to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-5 at 38. Accordingly, we agree with the postconviction court that Hampton failed to meet the second prong of intellectual disability.

### C. Onset Before Age Eighteen

Dr. Cunningham testified during the evidentiary hearing that there is evidence of onset before age eighteen, including that Hampton's mother had deficient intelligence and engaged in prenatal drinking, the latter being "a significant factor in the occurrence of [intellectual disability]." However, there were no witnesses to support the claim of prenatal alcohol exposure. In fact, Hampton's mother adamantly denied drinking once she discovered she was pregnant, and the postconviction court found her testimony to be unimpeached. Although testimony was presented that Hampton contracted spinal meningitis at age two, and the disease could have caused damage to Hampton's brain, there are no hospital records to support the claim that Hampton suffered from this disease. Moreover, when Hampton's mother was asked whether Hampton appeared slower than other children after his purported hospital stay for meningitis, she responded he was normal when he returned home.

Further, while Hampton was held back in school and was disruptive in class, there was also evidence of average or above average grades in most subjects. Moreover, there was testimony that Hampton showed signs of social leadership.

Based on the foregoing, there is competent, substantial evidence to support the postconviction court's conclusion that Hampton failed to establish that he suffers from intellectual disability.

As a sub-claim of this issue, Hampton also challenges the postconviction court's determination that trial counsel were not ineffective for failing to argue Hampton is intellectually disabled. However, trial counsel cannot be deficient for failing to raise a claim where counsel does not have a good-faith basis to do so. See Williams v. State, 987 So. 2d 1, 10 (Fla. 2008) (holding counsel was not ineffective for failing to seek the disqualification of the trial judge where counsel felt that he did not have a good-faith basis for filing a disqualification motion). Because we conclude Hampton has failed to establish that he is intellectually disabled, we also conclude trial counsel were not ineffective for failing to raise this claim. When trial counsel took over Hampton's case from the public defender, Hampton's records showed that his most recent IQ score was 89 on the CFIT. Attorneys Lastinger and Watts testified they each spent over sixty hours with Hampton, and nothing about Hampton's demeanor was inconsistent with this IQ score. They also reviewed Hampton's medical, school, and prison records,

interviewed family members, and consulted with mental health experts, and none of these sources revealed any indication Hampton could be intellectually disabled. Moreover, none of the mental health experts who evaluated Hampton raised the possibility of intellectual disability, including Dr. Berland, who found Hampton to be incompetent to stand trial. Accordingly, there was no basis for trial counsel to file a motion to preclude the State from seeking the death penalty. Trial counsel reasonably relied on their observations of Hampton and the opinions of their mental health experts. Therefore, we agree with the postconviction court's determination that trial counsel were not deficient.

Because we conclude that Hampton is entitled to a new penalty phase proceeding in light of Hurst, we decline to address his remaining claims, which relate to penalty phase issues.

### III.  **Hurst**

In Hurst v. Florida, 136 S. Ct. 616 (2016), the United States Supreme Court held that Florida's capital sentencing scheme is unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. On remand, this Court held that a unanimous jury recommendation is required before the trial court may impose a sentence of death. Hurst, 202 So. 3d at 57-58. Moreover, this Court held that "in addition to unanimously finding the

existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge." Id. at 54 (emphasis omitted). We also determined that Hurst error is capable of harmless error review. Id. at 67.

Hurst applies retroactively to defendants whose sentences became final after the United States Supreme Court issued its decision in Ring v. Arizona, 536 U.S. 584 (2002). Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016). Hampton's convictions and sentences became final after the issuance of Ring. Further, he presented a Ring challenge on direct appeal, see Hampton, 103 So. 3d at 116. Thus, Hurst is applicable to him.

Accordingly, we must determine whether the Hurst error during Hampton's penalty phase proceedings was harmless beyond a reasonable doubt. "[I]n the context of a Hurst error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to [the] death sentence." Hurst, 202 So. 3d at 68. As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found

there were sufficient aggravating factors and the aggravating factors outweighed the mitigating circumstances.

We conclude the State cannot establish that the error in Hampton's case was harmless beyond a reasonable doubt. The jury in this case did not make the requisite factual findings, and the jury did not unanimously vote to impose a sentence of death. Instead, the jury vote was nine to three. Further, Hampton was not formally charged with or convicted of the underlying felonies in support of the aggravating circumstance that the murder was committed during the commission of a robbery, sexual battery, and burglary. Therefore, there is no way of knowing whether this aggravating factor was found unanimously by the jury. Likewise, there is no way of knowing whether the jury unanimously found the HAC aggravator, or whether the jury unanimously found that the aggravating factors outweighed the mitigation found to be established.

Any attempt to determine what findings were made by the three jurors who voted for life and the nine jurors who voted for death would amount to speculation, and cannot rise to the level of proof beyond a reasonable doubt. Accordingly, the error in this case cannot be considered harmless.

**CONCLUSION**

For the foregoing reasons, we affirm the denial of postconviction relief as to Hampton's claim alleging that counsel were ineffective during the guilt phase of

- 39 -

the trial.  We further affirm the determination that Hampton is not intellectually disabled.  However, we grant the petition for writ of habeas corpus, vacate Hampton's sentence of death, and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to Hurst.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Pinellas County,
      Richard A. Luce, Judge - Case No. 522007CF012699XXXXNO
And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, and James L. Driscoll, Jr., David Dixon Hendry, and Gregory W. Brown, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

      for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

      for Appellee/Respondent